before the snow starts. We're very pleased to have with us our very distinguished and able colleague visiting us from the United States District Court, Northern District of Illinois, Judge Edward Chang, joining our panel. So we're pleased to have you here, Judge Chang. Thank you. Thank you for having me. And we're ready for our first case, Indianapolis Airport Authority v. Travelers Property Casualty Company. And is it Ms. Seamans? Did I pronounce that correctly? All right. Good morning. May it please the Court. My name is Rebecca Seamans from I.C. Miller LLP representing the Indianapolis Airport Authority in this insurance coverage dispute against Travelers Property Casualty Company of America. The airport appeals the District Court's summary judgment order regarding the interpretation of three coverage provisions in the insurance policy that was issued by Travelers. The policy applies to a partial collapse that occurred during construction of the new midfield terminal project in Indianapolis. The construction work had to be suspended immediately in order to investigate, inspect, and repair the structure. As a result, there was a significant delay in the project, which the airport was able to mitigate by incurring costs to resequence and accelerate the work. The airport requests reversal of the District Court's summary judgment ruling that the policy does not cover unreimbursed construction costs that were incurred because of the incident, and also the ruling that the policy does not cover the airport's soft cost claim for the bond interest during the delay in completion. So let me ask you this, because I'm concerned about this risk of direct physical loss. How is risk of direct physical loss unambiguous where the term risks could reasonably be interpreted to mean both physical and economic risks? You're right, Your Honor. I believe the fact that direct physical loss, which appears only in the definition of a covered cause of loss, it does not appear in the context of what losses are covered. But the only place direct physical loss appears is in the context in the phrase risks of direct physical loss, which we believe is much broader than, it necessarily is broader than, only direct physical loss. And let me ask you one other question. What is your best argument for why the general coverage provision covers the loss you suffered as a result of delay in construction? Well, Your Honor, the general coverage provision doesn't include damages that result from delay, except to the extent that the general coverage provision, there is an exclusion for delay costs. We recognize that. But there's also a specific provision, the expense to reduce the amount of loss provision, which says that for expenses that are incurred necessarily in order to mitigate against the delay. And also under the general coverage provision, we're not seeking damages that are caused by the delay. We are seeking damages that were avoided by the virtue of expending construction costs in order to decrease the delay, mitigate against the delay. And that's under the ERAL provision, right? We believe, Your Honor, yes, it's under both the ERAL provision and also under the general coverage provision. And this policy permits... That's a tougher argument for you all, under the general coverage provision. But at the risk of going back to basics, it would be very helpful to me if you could actually just spell out exactly what categories of costs are in dispute here and their approximate amounts. Certainly, I'd be happy to, Your Honor. At this point, the airport has approximately $9.3 million of total construction costs, unreimbursed construction costs. Of that, approximately $4 million is for costs that were incurred due to investigation and inspection of the structure following the incident. That were not reimbursed yet? They have not been reimbursed. There's factual disputes as to whether or not those costs were incurred because of the incident. Okay. There are approximately, again, of the $9.2 million, there are approximately $4.2 million of construction costs that were incurred in order to resequence and accelerate the work, in order to mitigate... This is the mitigation? Mitigation costs, Your Honor, yes. And approximately $1.1 of additional construction costs that don't neatly fall under those two broad categories. And what about the soft cost claim? There is a soft cost claim in the amount of $7.4 million. And that's separate? That's separate. From all of those? That's correct. I have to say, based on the briefs, those numbers are surprises to me. Maybe I missed some things, but, okay. So that makes the total amount of the airport's claim that is before the court approximately $16.7 million. That's helpful, thank you. Now I'll start with the expenses to reduce the amount of loss provision. That was a provision that didn't garner very much attention in the district court's order, but actually applies to exactly the facts that happened here. That provision provides that in the event that there is a delay and the airport incurs expenses in order to reduce the delay, that the airport would be able to recoup those expenses. That it is no more than the amount of the soft costs that were avoided. It's important to look at the financing of this particular project. Unlike a lot of construction projects where there's just a construction loan that's obtained only for the amount that will be required to complete the project. Here this project was financed using the issuance of municipal bonds that were in excess of what would be needed to construct the project. It was to finance the entire capital improvement program for the airport. The airport and travelers had conversations and discussed extensively the fact that that's how this project was going to be financed, and at the airport's request, soft costs was broadened to include bond interest. Before that addition to the policy, and already under the definition of soft costs or under the type of soft costs that are covered, there's already a provision that says that interest on money that is used to finance construction is a soft cost. This is in addition to that. It was an added term. Bond interest will be a soft cost under this policy. The conversations and discussions between the airport and travelers before the policy was issued specifically talked about what kind of expenses and what kind of bond interest would be implicated if there is a delay. They discussed an 18-month delay and talked about the fact that would result in $60 million of bond interest. Travelers' underwriters analyzed a hypothetical situation before the policy was issued in which there would be a five-month delay and concluded that there would be $13.5 million in bond interest. That's very similar to the delay that actually occurred on this project. When the event occurred... Can I stop you? Certainly. Because the district judge, if I understood her decision correctly, said in essence the payments on these umbrella bonds, if we can call them that, for the whole capital project, the payments the airport authority made never changed, right? The total payments on the bond interest, Your Honor, did not change. And the scheduled payments, right. That's correct. Under the bonds, that's correct. Explain to me, explain to all of us, if you would, just briefly, it's easy to understand how a judge might look at that and say, how are you hurt by that? Correct. So explain to us, please, how are you hurt by that? Well, the debt service schedule, which the district court pointed to, was the schedule for how much the bond interest would be on those umbrella bonds, if you will. The airport planned, and this is reflected in the general ordinances that were part of the bond documents that were attached as exhibits to the summary judgment motion, the ordinances specifically contemplate that during the period of construction, the interest on the bonds would be satisfied by bond proceeds. Now, after the construction of the project, because there would be operations, those bond interest payments would be satisfied using revenues from the project. The plan was that we're going to utilize, again, the bond proceeds only through the period of construction. Then you open up, the airlines start paying rent. Correct. And you can pay the interest for that. Absolutely, Your Honor. And that was delayed until November 11th, right? That's correct. Okay. Can I focus in? I mean, I know that the deductible, the soft costs and ERAAL costs are kind of closely interwoven here. Yeah. On the question of soft costs, you seem to want to use the original projected dates of either substantial completion or actual opening and a hypothetical projected opening date in February of 2009 that the airport beat by, what, three months, right? Correct. Given the language, let me get to the right page of the appendix, but in the definition sections and particularly the definitions for period of delay and completion and planned completion date, I don't understand why the substantial completion date is even relevant here, nor do I understand why we shouldn't focus on the actual opening date. Thank you, Your Honor. Well, if I could refer the Court to page 25 of our brief, our opening brief, perhaps this might be an easier way. I'll agree with you that, well, I will submit that these definitions are somewhat confusing and need to be somewhat broken down. But from the perspective of the airport, it really doesn't matter whether or not you use the completion date as substantial completion or opening day. But our position is that it needs to be when you're measuring the period of delay and completion and you have a start date and an end date for a period, you need to either use what was the planned substantial completion and the ending date being substantial completion or the beginning date being what was the planned opening day and have the ending date be an opening day date. Well, but, no, no, no, apparently we're not connecting because if I understand correctly, original planned opening, September 28th, right? Correct. Actual opening, November 11th. Correct. Why isn't that the relevant time period? Initially, Your Honor, the airport believed that that's what was the relevant time period and that specifically explains why it was not included in a soft cost, a specific soft cost claim was not included in the proof of loss. But when you really break down the definition, what the definition for period of delay and completion says is that it will end on the date when the project should be opened using reasonable speed and similar materials and equipment. So is the theory of the airport authority that November 11th was achieved by unreasonable efforts? Extraordinary efforts, Your Honor. Okay, but that gets you, I can see that getting you the ERAL costs. I have a little trouble seeing why the insurance company should also be on the hook. I know they're not on the hook for anything under the district court's decision, but I have difficulty understanding why they should be on the hook for interest between November 11th, 2008 or 11 days after that and a hypothetical opening date during that entire period you're getting revenue. Understood, Your Honor. That seems very strange. Understood, Your Honor. And from our perspective, we didn't draft the policy. That's the definition that's put in the policy by travelers. And they informed us, as reflected in the briefs, that the airport cannot have an ERAL claim unless you have a soft cost loss. Yeah, we'll talk with them about that. That's bizarre. I can't answer the question on why the policy does not say that the period of delay in completion will end on the date the project is completed. But it does. The policy says it will end on the date using reasonable speed and similar materials and workmanship. And importantly, the date of November 11th is not the date that the project would be open using similar materials and equipment. The airport had to expend costs in order to get it to that point. And those costs are in your ERAL claim, correct? They are, Your Honor. That's correct. And let me make sure I understand the relationship between the ERAL provision and the soft cost. If it's your argument that the ERAL provision is not dependent upon the existence of a soft cost claim, how can your ERAL claim constitute substantial compliance of the requirement that you submit a soft cost claim? Because the ERAL claim necessarily involved an analysis and submission of factual information regarding the bond interest. The key elements for an ERAL claim include explaining why and how much of the soft costs would have been incurred during that period that was avoided. So in other words, in the proof of loss, the airport provided information regarding the daily calculation of bond interest that would be incurred and also the delay that was incurred and the delay that was avoided by virtue of the efforts that were undertaken. So it's our position that the airport was not required to identify every single theory of recovery in its proof of loss. The proof of loss provision does not require that and the law does not require that. What it requires is the provision of information regarding the facts of the loss and information regarding the damages. And that information was provided. And it all turns on the issue of how much bond interest. It's a very significant cost, obviously. It's $135,000 every single day that the airport's required to carry that interest payment in a way that had not been contemplated. But that's the tie between the two of them and why. If a traveler's position is true that you must have a soft cost claim in order to have an ERL claim, we would submit that by virtue of submitting an ERL claim. We're putting travelers on notice that we therefore must have a soft cost claim because if they are all tied together, which is not a position that the airport advocates. That's certainly true under the insurance company's theory of the way the policy works. Does Indiana insurance law require either side in this sort of a dispute to identify definitively its legal theories before the litigation begins? No, Your Honor. In fact, we think the case law is very clear and cited in our brief that pre-litigation statements are not considered binding admissions. On either side? I believe that's probably accurate, yes. But the problem is the airport was not advised early on in the process. Bond interest was an issue from the very beginning right after the incident happened. There was a discussion and there was a sharing of information regarding the bond interest. Travelers did not tell the airport, you can't have an ERL claim unless you go out and issue a bunch of new bonds and have a whole new bond series so that you'll have interest that will actually qualify as a soft cost claim. So we raise that issue in the context of a defense when travelers are saying that somehow the airport waived its right to a soft cost claim by not specifically providing that theory in the proof of loss. And again, conditions proceeding are to be strictly construed against the insurance company. And if you look at that provision in the policy, it does not say that if you fail to include it in the proof of loss that somehow you've waived the claim. In fact, to the contrary, the proof of loss form that was provided by travelers that the airport submitted says on its face that additional information may be provided and will be considered as a supplement to the proof of loss. Now you're in your rebuttal time, you're free to use it, but I just wanted to make you aware of that. Understood. Thank you, Your Honor. I'll say just a word or two about the general coverage provision. We've touched on it briefly. I just wanted to highlight the fact that the policy does not use the phrase direct repair cost, which is a phrase that Travelers uses throughout its brief, and that phrase does not appear. Although the word repair appears throughout the policy in different contexts, it doesn't simply and straightforwardly advise the insured that the only thing you're able to recover under the general coverage provision is direct repair costs. And with that, if there are no other questions. On rebuttal, if you could just tell us, explain to us at some point where that February 2009 date came from. The February 22, 2009? Yes, the estimated completion date. That was a projection that was prepared by the construction manager and was provided to travelers at the time. It was an estimate. If we continue on doing what we had normally planned to do with our normal course of construction, when do we anticipate the airport's going to be open? And that date was determined. Okay. Thanks. Thank you. All right. Thank you. Ms. Chapnick. May it please the Court. Good morning, Your Honors. I think it's important to start off my argument because we've been around these different coverage provisions, but I think it's important to go back to understand the structure of this policy and the different provisions because Indiana law follows the rules of construction that you've got to read the document as a whole, you've got to harmonize all provisions, you have to read all the phrases, and you have to give them all effect. And this is a manuscript, Builder's Risk Policy, which was specifically written for IEA. What's a manuscript policy? Manuscript means that it's not a standard form. Okay. It was custom negotiated. It's not an ISO form, which is Insurance Service Offices. They issue forms. But this is a specific policy written by travelers that had different modifiers and provisions that could be put in or taken out depending on the situation. Now, this Builder's Risk Policy, and Your Honor asked the question early on to Ms. Siemens about the general coverage provision and the risks of direct physical loss. So we've got to start there because that's the insuring agreement. That tells us what is covered by this policy. And if you look at the language, we will pay for loss, meaning accidental loss or damage, to covered property, which is defined as Builder's Risk, which is the buildings under construction, from any of the covered causes of loss, risks of direct physical loss. The only accidental loss or damage that could occur to the buildings under construction is physical damage. And that's what all the case law that says. The One Place case, the Tochi case, the Vision case, Ocean Child, all those cases that talk about that specific provision says we only cover the actual physical damage to the building. And it makes sense when you go further in the policy because the very next coverage underneath that is soft costs. Soft costs is an economic cost. If the general coverage provision provided coverage for economic costs, as IA suggests, there would be no reason to have a soft cost provision. And then going further, if you look at the additional coverages underneath that, those are various other economic costs, expediting costs, ERAL that we talked about.  And that's why the policy is structured in this way. So when the district court determined that the general coverage provision was limited to paying for the direct physical damage caused by the Shoring Tower incident, not everything in the world, to the buildings under construction, that exactly followed the language of the policy and the cases that had interpreted that provision beforehand. So the big rub in this case, obviously, is their attempt to seek recovery for these soft costs of $7 million and then separately another $5 million or so of what they call resequencing costs, additional costs of additional construction, other types of economic costs, which aren't covered under this general coverage provision. So you have to see, all right, is there a place in this policy that provides coverage for that? Well, let's talk about soft costs for a minute. And they want to get away from the language of the soft costs. We have the, we will pay soft costs during the period of delay in completion, but you can't end your analysis of the soft cost provision right there. You've got to look at the definition of the term soft cost, which is a defined term in this policy. So if you turn to docket 222-3, the soft cost. Sorry, what? 222-3 is the policy. That is not, okay. That's not how we have this. Oh, I'm sorry. We have it in the appendix. Oh, you're right. You're right. I'm sorry. Well, if you turn to page 13 of 14 of the policy, which is the definition page, you see paragraph 24, which is the soft cost definition. And the soft cost definition says soft costs means your actual and necessary business costs in excess of your budgeted amount for the project consisting only of the types shown in the declaration. There's only four types in this policy shown in the declarations, and those are the four that are listed on the declaration page. Interest on money borrowed to finance construction, advertising expenses, costs resulting from renegotiation of leases, and bond interest and penalties. For the purposes of this case, the only soft cost at issue in this case is bond interest. That's been admitted in the lower court in the briefing. And so then you have to look at, all right, what they want to recover as a soft cost is their ordinary bond interest between the two dates that never changed. If I may interrupt, is there something in the policy or the declarations itself that tells us what is the budgeted amount in a dollar sense? There's nothing in the declaration that says the budgeted amount in a dollar sense. And that wouldn't make sense in a policy like this because every project is different. But you said it was a manuscript policy. So you could have inserted something like the debt services schedule, for example? I've never seen a policy that had a debt service schedule attached to it. But in the case of this case, the budgeted amount consisting only of the types in the declaration is the budgeted amount for the bond interest, which is the debt service schedule that they provided. In fact, in their briefs on summary judgment, their argument was, hey, that term budgeted amount is not ambiguous. Usually each side says it's not ambiguous and favors itself. But I don't see how it's not ambiguous, frankly. At least that it doesn't ambiguously mean what you say it means because we've got an insurance policy specific to the project, the midfield terminal, and bonds intended to cover a number of other capital projects as well. And certainly the airport authority was worse off as a result of the delay in terms of the interest that it paid and the income that was coming in. Well, they weren't, Your Honor, because there's been admissions throughout this from the IAA's 30B6 deponent that there was never any change to the bond interest. They never suffered any penalties. I understand that, but they did not have income available to pay the interest because of the change in the damage to this project. Could I ask you, I know you want to talk about interest, but I'd really like to hear you talk about ERAL. Sure. Where your position and the district judge's analysis seem to create some very strange incentives for the insured. Well, all right. So to understand ERAL, you've got to go to that provision in the policy, which you will find at page 5 of 14. And you'll note that this is an additional coverage. It's in addition to the direct physical loss. And the ERAL provision says, and the court can read it, but the most important part of this particular provision is the very last sentence of it, which says no deductible applies to this additional coverage. I'm sorry, the sentence before that. Well, tell me about the no deductible. I see the sentence above it, but tell me about the district court focused on that. Well, the policy says no deductible applies, but the sentence before it says we will not pay more for your expense, meaning the expense to reduce the loss, than the amount by which such expense reduces this defined term amount of loss, which is the sum of the soft costs we would have otherwise paid. So the ERAL provision, as the one-place court, Judge Finnegan in one place, recognized that Judge Finnegan, Magistrate Judge Finnegan, Sheila Finnegan. This case is from Indianapolis. Wasn't it Judge Stinson who decided this case? No, I'm referring to the one-place, because the one-place court interpreted this particular provision as well. And this particular provision is directly tied to the soft cost provision, because they're only going to pay ERAL. Counsel, I understand your linguistic argument, but there may be some play in the joints of the language. And the question is, this creates just perverse incentives, doesn't it, for the insured to say, well, if we're incurring ERAL costs, we want to make sure that we are above the deductible in the delay on the soft costs, right? The policy has duties. They have a duty to mitigate. They have a duty to mitigate, and you have some duties to pay them, including mitigation costs on the ERAL. If it's covered. And so could you address more specifically the hypothetical that the plaintiff put in its brief at page 34 about the delays, the incentives in essence to not put the pedal to the metal and get to completion as soon as humanly possible? So with regard to that hypothetical, they always have that duty to perform that. And had they bought more expediting coverage, there was only $100,000 of expediting coverage. Many of what they're calling ERAL is the type of expediting costs that they're moving more quickly to get this done. The problem is they hit their limit of $100,000. They could have bought more expediting coverage to cover it, but they didn't have it. They were also paying for ERAL coverage, right? I'm sorry? They were also paying for ERAL coverage, right? Correct, but ERAL, the whole purpose of ERAL is to, if you're going to move faster and you're going to decrease the amount of soft costs. It's a dollar-for-dollar thing. Every soft cost that the insurance company saves will pay you a dollar of ERAL because you brought down the soft costs. That's why they're tied together. So if you didn't have any soft costs that were, quote, otherwise payable under the policy, as is the case here, then you have nothing to bring down. And so that's why these are tied together. So that leaves the insured with an incentive to not exactly rush quite as much, right? Well, they always have a duty. I know they have a duty, and you surely know how difficult that would be to enforce, right? In a project this complex, you want to keep incentives aligned between the insurer and the insured to get the repairs done in as economically rational and prompt a way as possible, right? Everybody should have that incentive. Correct. And your interpretation of your policy blows that up. I disagree, Your Honor, because this policy is very specific about what it pays for. Had they had a payable soft cost, if they had $100,000 of payable soft costs, then they might have ERAL because if that ERAL brought down the soft costs. But the problem is they didn't have a payable soft cost under this policy, which is why these two provisions are intertwined. So let me ask you this. If the delay was 91 days and the airport authority had a compensable claim for one day of soft cost coverage, what expenses would the ERAL claim cover? The ERAL would cover the dollar-for-dollar relationship between the soft costs and the ERAL for that day. But the problem is the deductible issue is with regard to the soft costs. But your position is also that none of the soft costs are payable at all because there were none because there was no change in the interest payments, right? Well, we have about four positions on it. Right. No change in the interest payments, so there's no excess. So we get past that. We assume you're wrong on that, and then we get to Judge Williams' question, right? Well, no. Then we get to they breached the policy duties, they waived the soft costs, and they didn't get past the 90-day deductible. So let's focus on the deductible question, as Judge Williams asked. Ninety-one days, what's payable? Well, I don't know what the amounts are, Your Honor. Wouldn't it just be $135,000, one day's interest? It's possible. It depends on what the amount of the soft costs are. They wouldn't get more ERAL than the soft costs. They would get for whatever soft costs that they brought down. Counsel, on your argument about the waiver on the soft costs, when exactly are the parties locked in under Indiana insurance law to particular theories? Well, under Indiana insurance law, the insured has a duty to comply with the duties in the event of loss under the policy. They told you we're getting these losses. You provide a form that says that you can take additional information, right? We asked for a sworn statement of proof of loss, which they have admitted is the formal mechanism to present their insurance claim. Are they locked in? And when are you locked in to theories of defense? When are they locked in to theories of what their claim is? You have to look at the handling of the insurance claim separately from the litigation because we asked them what your claims are. They told us we had a claim for X dollars for direct costs, another amount for ERAL, and they said nothing for soft costs. So we said to them, and I need to correct an error Counsel made because right after in response to their July 17, 2012 letter where they asked us about or they provided the sworn statement of proof of loss, the company submitted an August 10th letter saying, Look, you haven't given us a soft cost claim. Are you making a soft cost claim? Because the soft cost claim is directly interrelated with the ERAL claim. And they responded to that on August 17th of 2012 and said, We are making no soft cost claim per se. No soft cost claim. They tell us that again. So we had been asking for a soft cost claim for six years prior to getting it. So we have the right to rely upon their formal presentation of claim because we use that to determine our rights and liabilities under the policy. But if the two parties are working from different legal understandings of the policy, if they think, for example, they can make an ERAL claim even if they don't bust through the deductibles on the interest, and you take the opposite position, then you're like ships passing in the night until you get to court and you start straightening out these disputes. Well, it's not an issue of legal theories, Your Honor. This is their insurance claim, and we have the right to be able to investigate the insurance claim, know what they're claiming as a soft cost so that we can hire forensic accountants, we can look at the numbers, we can determine whatever it is we need to determine. They tell us twice, No, we're not making such a claim. And then they file a complaint, an amended complaint, neither of which make a soft cost claim, and five months later that's when they first make a soft cost claim in litigation. So with regard to an insurance policy, the insured is bound to follow the policy duties. The Indiana law says there are conditions preceding to recovery. You can't even file a lawsuit. The Schifrin case, the Morris case, you can't even file a lawsuit. Do those involve shifting claims as opposed to failure to present claims? I'm sorry? Do any of those cases involve the shifting of claims or supplementing of claims as opposed to simply failing to present a claim and notify the insurance company of a loss? Not that I'm aware of. There's a pretty big difference, isn't there? Yeah, but this is not a shifting of a claim. This is we're telling you we have no claim, and then in litigation we're going to make up a claim, and we're going to present this claim, and we're going to go back to reinvent this whole soft cost claim, which we told you you didn't have for six years, so that now the insurance company didn't have the opportunity to investigate it back then, didn't have the opportunity to hire a forensic accountant back then. The adjuster who was handling it at that point in time has passed away. This all came out in litigation when they realized that to trigger their ERAL, which is what they want, they need the soft cost claim to be able to trigger it based upon the policy language. So then in answer to my question about the 91 days, and the airport authority had the compensable claim for one day of soft costs, a number being $135,000 like Judge Hamilton said, your response is it depends on the expenses, right? I mean, that's the essence of your response. Because the other thing I want to know is if the airport authority had expended funds to mitigate the delay from over 90 days to under 90 days, such that they would not have had a compensable soft cost claim, they could never recover under the ERL provision, right? As long as they have a payable soft cost claim, they could recover it. If they had enough expediting expense, they could recover those fees, but they couldn't get ERAL if it brought it under the soft cost claim, under the deductible. So I guess the answer to your question is yes, that's true. But that's why these provisions are tied together. I see my time's up. May I ask one more? Yeah, just concretely on the February 22, 2009 date, does travelers dispute that that is the projected date of completion after using reasonable speed and materials? Yes, because, well, number one, you have to look at the language of the policy, which provides the time frame. So the language of the policy, the period of delay in completion ends with the date. No, I'm sorry. Let me just, since you're also out of time, I think pardon the interruption. The question is just assume for the moment that your theory as to it opened up on this date and it was put into operation and use and, therefore, that's the end date, the deductible period. If we were to reject that, is there a factual dispute on whether or not February 22, 2009 is the projected date? There's not a factual dispute because actually IAA admitted in its underlying pleadings that that end date was December 16, 2008. So if you measure it from the September 28, 2008 date to the December 16, 2008 date, it's 79 days. It's less than the 90 days. And so there's not a factual dispute as to that because that's the date that they came forward with. So in response, we accepted that date is true in the underlying pleadings. If I could just ask one other quick question. Some of the briefing in this case is under seal. Is there any information about transit negotiations from 10 years ago that still needs to be kept under seal? We filed a motion relative to a more limited set, which was granted, I believe, a couple weeks ago. My question, though, is what needs to still be kept under seal? So the parts under seal are the underwriting guidelines and certain portions of the underwriting, not all of the underwriting back and forth, but there are some that had rates which are used, and they're proprietary rates of travelers that are used to determine premium. And so there was a MMR document that has rates and reinsurance information and so forth. And so we identified some of those. It's pretty dated at this point, isn't it? Well, but I don't know what rates they're using today, but it's their rates. I mean, that's proprietary information to travelers. This court upheld our motion and agreed that the more limited set of documents that we requested remain under seal be, in fact, under seal. That's before we have to write opinions, however. Thank you. You're welcome. All right. Thank you, Counsel. She got some additional time because of additional questions, so I'm going to add an additional three minutes. Thank you, Your Honor. I'd like to address initially one point that Counsel made. The airport stated in the underlying briefing that the projected completion date was December 16, 2008, because it was the airport's position that the correct measure would be the substantial completion date. If the court is instead going to use as the unit of measure for the period of delay in completion, if the completion date is going to be opening day instead of substantial completion, then it's very clear in the underlying pleadings that the airport's position is that the final date would be February 22, 2009. So it depends on you just the problem is you just can't simply compare apples to oranges. You either have to use substantial completion as the measure or opening day as the measure. All right. And if I can ask, this February 22, 2009 date, what's the evidentiary support for that? There's an affidavit that's been submitted in support of the summary judgment motion executed by the project manager for the construction manager saying that they had calculated what would be the projected date. Attached is a construction schedule showing both the dates of the projected dates of opening day and the projected date of substantial completion. And then the travelers in response to that factual assertion, what did they say? I recall, Your Honor, that travelers who's taken the position that the correct measure should be, I believe this is correct, opening day, that they had a consultant who disagreed with that by a matter of a week or two. And didn't exactly agree with February 22, but I think put the date sometime in February of 2009 is my recollection. All right. Thank you. I also want to address something that came up with respect to these additional coverages and the fact that the allegation was travelers has taken the position there'd be no reason to have these additional coverages. The general coverage provision were as broad as the airport has submitted. And there's a key point that needs to be made. All of these additional coverages contain within them sublimits, additional sublimits. And there's a provision in the policy that says it's entitled limits of insurance and makes clear that any of the additional coverages that have their own sublimits will be on top of the basic limit of insurance, which is $787 million, I believe is the basic limit of insurance. But these coverages would extend beyond that. So that's one reason why those provisions would be in the policy. And going back, just stepping back as a broader issue, if the situation is going to be as travelers has projected here with respect to the bond interest, then that essentially means that the airport got no value for some significant coverage that was purchased at significant cost and premiums for both soft cost coverage and ERAL coverage. And that was specifically discussed by the parties in advance of this policy being issued. They weren't talking about if you have an issue and you have to go out and get additional financing, what would be your soft costs or what would happen if we had to issue a whole new series of bonds. They were talking about the financing for this project as intending to be covered as part of the soft cost coverage. And travelers has taken the position that the budgeted amount, we agree that that's a key term here, is what was the budgeted amount, and that's the term that's ambiguous in this situation because there is no budgeted amount that's reflected, as Your Honor pointed out in the questions. There's no budgeted amount indicated. The debt service schedule, we disagree. That is not the budgeted amount for this project. The debt service schedule reflects the amount that needs to be paid for all of the bonds, not just for those bonds that are applicable to this project. And we also would point out to the extent that travelers is concerned or raises the concern that somehow it was tricked into believing there's no soft cost claim. We disagree with that completely. The evidence has been that travelers continued to investigate the issues surrounding the bond interest, asked questions about the bond interest. The airport answered those questions and provided detailed information. Travelers requested information about the resequencing costs, the acceleration costs, during the period of adjustment, even after the proof of loss had been submitted. So if, in fact, there is no coverage for the ERAL,  that was continually being investigated, and the Travelers 30B6 witness, when asked about what prejudice was incurred, indicated there was no prejudice. But the magic word, soft costs, were not used during the course of this investigation? Your Honor, during the course of the investigation, it was in the context of the soft costs and the bond interest that was avoided. That's correct, Your Honor. So those words were used? Bond interest was certainly used, yes. That's correct, and soft costs were certainly used. With an assumption that soft costs claim then was, that's what it was derived from. To the extent that you have to have one to have the other, then the soft costs were always part of the picture. All right. Thank you to both counsel. We'll take the case under advisement.